NOT FOR PUBLICATION

Signed: May 10, 2005

_____
**RANDALL J. NEWSOME**
**U.S. Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| In re Manuel Steve Camarillo, | Case No. 03-45580-N7 |
| Debtor. | Chapter 7 |
| Albert Cianfichi, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 03-4858AN |
| Manuel Steve Camarillo, | |
| Defendant. | |

**FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW**

This matter is before the Court pursuant to an adversary proceeding filed by the Plaintiff, Albert Cianfichi (herein "Cianfichi") to determine whether Manuel Steve Camarillo (herein the "Debtor") should be denied a bankruptcy discharge, and also the enforceability of a gambling debt incurred by the Debtor. In accordance with Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052,[1] upon consideration of the record in this case and the testimony, evidence, and pleadings submitted to the Court at and after a February 14, 2005 trial, the

---

[1] Unless otherwise indicated, all section and rule references are to the Bankruptcy Code, 11 U.S.C. sections 101-1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

Court hereby submits the following findings of fact, opinion and conclusions of law.

**FINDINGS OF FACT**

1. Cianfichi is the sole proprietor and operator of Kelly's Restaurant, Bar and Gaming (herein "Kelly's"), a licensed gambling establishment located in Antioch, California. (Trial Transcript ("TR") at 5, 61).

2. One evening in November or early December of 2002, the Debtor visited Kelly's and won $15,000 gambling in table card games. The Debtor did not take his $15,000 in winnings home with him that night, but instead left that money in the safe at Kelly's. Kelly's safe is also commonly referred to as the "Player's Bank." Thereafter, the Debtor returned to Kelly's and withdrew some of this money for additional gambling and to treat his children to dinners and movies. (TR at 7-10, 22). As of December 10, 2002, the Debtor had about $10,000 of his money left in the Player's Bank at Kelly's. (TR at 66, 75-77).

3. On December 10th, Cianfichi arrived at Kelly's at about 5:00 p.m. After he arrived, Cianfichi had a conversation with his employee, Jeri Leslie ("Leslie"), a floor manager at Kelly's. Leslie told him that the Debtor had about $10,000 in the Player's Bank. (TR at 74-75). Leslie also worked as a card dealer that evening, as did Kathleen Hurtado ("Hurtado") another Kelly's employee. (TR at 31, 92).

4. Sometime shortly after 7:00 p.m. on December 10th, upon conclusion of a 12-hour work shift at the Gaylord Paper & Pulp box factory, the Debtor and a few of his co-workers arrived at Kelly's. (TR at 23). The Debtor exchanged his $10,000 remaining in the Player's Bank for gambling chips and began to play and wager at a blackjack card game. (TR at 25-26).

5. At some point before 8:00 p.m. on December 10th, Leslie informed Cianfichi that the Debtor had already "used up" the $10,000 he had in the Player's Bank, and was "into us [Kelly's] for quite a bit of money," possibly as much as $10,000. (TR at 78, 82). Cianfichi responded by telling Leslie "please, no more" and gave her specific instructions not to advance the Debtor any more credit. (TR at 78). This apparently was in keeping with Cianfichi's policy to occasionally advance small amounts ($20 to $60) to good customers so they could gamble in low stakes poker

games, but not to advance credit to customers gambling at high stakes poker or blackjack. (TR at 79-80). Having suffered a stoke in the recent past and still feeling the aftereffects, Cianfichi left Kelly's at about 8:00 p.m. that evening. (TR at 66).

      6.    Despite Cianfichi's policy and instructions, over the course of the evening of December 10th, Leslie advanced the Debtor a total of $60,000 in credit to gamble on blackjack. (TR at 3, 81-82). The Debtor obtained this money by signing five counter checks or markers ranging in value from $5,000 to $20,000 each. (TR at 5). Leslie filled out the markers listing Kelly's as the payee, and presented them to the Debtor for his signature. (TR at 86, 88; Plaintiff's Ex. 1). The markers were then exchanged for gambling chips. The Debtor received all of his chips from Leslie, who periodically throughout the evening asked the Debtor if he wanted additional chips. (TR at 31). The markers could be exchanged only for chips, which were good only at Kelly's for gambling or purchasing drinks or food. (TR at 82-83).

      7.    The Debtor suffers from irreversible liver damage, diabetes, hepatitis, memory loss, vertigo and arthritis. While gambling on the evening of December 10th, the Debtor consumed "quite a bit of alcohol" which was either purchased by him or his friends, or possibly provided by Kelly's as complimentary. (TR at 23, 25). During that evening the Debtor "won at certain points and returned chips," but didn't keep track of how much money he won or lost. (TR at 34-35). Concerned for the Debtor's health, during the course of the evening his cousins arrived and attempted to get him to leave the game. With his legs swollen and numb, the Debtor finally stopped gambling. (TR at 29-30).

      8.    The Debtor testified that he gambled at Kelly's from 7:00 p.m. on December 10th for about the next 25 to 28 hours. (TR at 24). Cianfichi testified that this could not be accurate because he understood that the blackjack game "broke up" by 7:00 a.m. the next morning, on December 11th, some 12 hours after the Debtor arrived at Kelly's. (TR at 67). Regardless of how many hours the Debtor actually gambled, it is undisputed that by the time he stopped he had lost all of the $60,000, except for $2,800 in chips, leaving a balance owed of $57,200. (TR at 6, 11, 68, 87-88).

9. After leaving Kelly's the Debtor slept for most of the rest of that day. (TR at 33). Upon arriving at Kelly's at 5:00 p.m. on December 11th and learning that Leslie had extended the Debtor $60,000 in credit, Cianfichi "nearly had another stroke." (TR at 68).

10. At some point, possibly on December 12th, Leslie contacted the Debtor and asked him to come by Kelly's to speak with Cianfichi. Upon doing so the Debtor was shocked to learn that he had lost $57,200. The Debtor told Cianfichi that he would check into getting a loan on his house or see if he could obtain money from his 401(k) account to pay the $57,200. (TR at 32-34). Ultimately, the Debtor was unable to qualify for a loan on his house because his income was not sufficient. The Debtor did not obtain any money from his 401(k) account. (TR at 12, 33, 37-38). Thereafter, on a "number of occasions," Cianfichi unsuccessfully sought payment of the $57,200 from the Debtor. Cianfichi and Leslie even visited the Debtor at Gaylord Paper & Pulp in an attempt to collect the money. (TR at 11-12, 69).

11. Kelly's cardroom hosts two different card games: poker and blackjack. (TR at 79). A player sitting at a table bets and plays his cards dealt for each hand. Additionally, on the face of the table in front of each sitting player are three circles in which other players may also place bets to play along with a sitting player's hand. These other players are sometimes referred to as "tail riders." Including the tail riders, there may be 14 or 15 players betting on a single hand. (TR at 27-28). Kelly's cardroom derives revenue from table fees paid by each player, including tail riders, for each bet on a hand of cards. The table fees range from 50 cents for each bet between $5.00 to $50, $1.00 for a bet from $51 to $100, and $1.00 for each additional hundred dollars bet on a hand. Table fees are paid directly to Kelly's for hosting the games. (TR at 64).

12. In Nevada-style gambling, a player plays against the gambling establishment, commonly termed as playing against "the house." In Nevada the house may "bank" its own games, meaning that it collects from the losers and is responsible for paying all winners. Pursuant to California law, however, Kelly's may collect the table fees but is not allowed to bank its own games. (Cal. Business & Professions Code §19805(c); Penal Code §330.11). Kelly's employs BJ's Gaming ("BJ's") as a third-party independent contractor to bank games played at Kelly's. (TR at

62-63; *Hotel Employees and Restaurant Employees International Union v. Davis*, 21 Cal. 4th 585, 608, 88 Cal. Rptr. 2d 56, 75 (1999) ("game. . . may be banked by someone other than the owner of the gambling facility").

13. Kelly's does not have a written agreement with BJ's to bank the card games. (TR at 94-95). Cianfichi testified that pursuant to an oral agreement, BJ's maintains a balance of $10,000 in Kelly's safe to cover bets made at the card tables. (TR at 63-64). Cianfichi also pays a representative from BJ's an hourly fee to sit at a card table and bank the game. (TR at 95). BJ's pays Kelly's a $2.00 fee per hand for each banked game. (TR at 64).

14. Banking a game at Kelly's begins with a player going to Kelly's cage with cash or a marker and exchanging the same for an equal amount of chips. (TR at 96-97). The player then takes the chips to a card table and places his bet on a hand. BJ's representative sits at the card table with a stack of chips. (TR at 94). When a card hand concludes, BJ's collects chips the losers had bet and pays chips to any winners. (TR at 65). The gambling action does not slow down much and many hands are played during the course of an evening, so this process is repeated many times. (TR at 29, 68).

15. Whoever wins or loses on a given hand or night supposedly has no effect on Kelly's, because only the players and BJ's may win or lose at a card game. (TR at 63, 65, 95). At the end of an evening, the players and BJ's representative take whatever chips they may have back to Kelly's cage and exchange them for cash. (TR at 97).

16. This system works when a player obtains chips from Kelly's cage in exchange for cash. But when a player originally obtains chips on credit, and signs a marker, there is no such corresponding cash in Kelly's safe. As such, when BJ's went to cash out at the end of the evening, there was not enough cash in the Player's Bank to cover $57,200 in chips BJ's presented to the cage. Months later, Cianfichi used his own money to pay BJ's the $57,200. (TR at 72-73).

17. Kelly's pays its dealers $6.75 an hour, and BJ's also pays the dealers "a small amount." Cianfichi testified, however, that the dealers "really make their money by tips" from the players, "so they have a selfish interest to keep it [the game] going and to keep providing them [the

- 5 -

players] with money." (TR at 91). On the evening of December 10 th, "Leslie probably advanced him [the Debtor] the money because he was very generous with his tips." That evening, dealers Leslie and Hurtado "made quite a bit of money." (TR at 92).

18. During February or March of 2003, the Debtor's poor health caused him to step down from his position as a machinery operator and crew leader and take a job as a forklift driver, "one of the lowest paying jobs" at Gaylord Paper & Pulp. The Debtor's income fell by $20,000. As a result, the Debtor was having a "hard time" paying his debts, including the mortgage on his house, located at 417 Lawton Street in Antioch (herein the "Antioch Property"). During this time the Debtor borrowed money from his relatives, in particular from his brother, Ronald Camarillo, who began to make the Debtor's mortgage payments. (TR at 37-42; 59-60). The Debtor estimated that the Antioch Property was worth about $200,000 and that he owed $118,000 on his mortgage. (TR at 58). The Antioch Property was the Debtor's largest financial asset. The Debtor's 401(k) account, with a balance of about $13,000, was his second largest asset. (TR at 16).

19. On or about April 23, 2003, the Debtor executed two grant deeds. The first deed was recorded on May 14, 2003 and transferred one half of the Debtor's interest in the Antioch Property to his brother, Ronald Camarillo. This deed characterizes the transfer as a "bona fide gift," and states that the Debtor and Ronald Camarillo held the Antioch Property as joint tenants. (Plaintiff's Ex. 3). On or about August 27, 2003, the second deed was recorded which transferred the Debtor's remaining one half interest in the Antioch Property to Ronald Camarillo. This deed characterizes the second transfer as a gift. (Plaintiff's Ex. 4). Also on or about August 27, 2003, at the same time this transaction concluded, Ronald Camarillo completed a refinance of the Antioch Property and recorded a new $131,000, 30-year mortgage obtained from American Gold Mortgage Company. (*See, Plaintiff's Request for Hearing on Claim Objection*, doc. #25, attached Ex. C, *Mortgage Recordation Information*). Some of the refinance money went toward repairs on the Antioch Property. The Debtor did not receive any of the refinance money. (TR at 47-48). Debtor has continued to live at the Antioch Property with one or two of his children. (TR at 43-44, 46, 50, 56).

Case: 03-04858    Doc# 23    Filed: 05/10/05    Entered: 05/11/05 12:31:58    Page 6 of 17

20.     On or about June 26, 2003, the Debtor lost his job at Gaylord Paper and Pulp. (TR at 40). In July of 2003, Cianfichi filed a lawsuit against the Debtor in Contra Costa County Superior Court to collect $57,200 on the markers. (Adv. Pro. No. 03-4858, *Complaint* at ¶25). At this time another lawsuit filed by the Fireside Thrift Company, concerning a debt owed by the Debtor on an automobile, was also pending against him in the Superior Court. As to this lawsuit, on August 7, 2003 the Superior Court entered a default judgment in favor of Fireside Thrift and against the Debtor in the amount of $11,079.22. (TR at 17-18; Fireside Thrift *Proof of Claim*, attached *Superior Court Judgment*).

21.     On September 26, 2003, the Debtor voluntarily filed a petition under Chapter 7 of the Bankruptcy Code. The Debtor failed to include his 401(k) account and did not list as a gift or otherwise any transfer of the Antioch Property on his bankruptcy schedules or statement of financial Affairs. (TR at 15-16; *Petition, Schedules and Statement of Financial Affairs*, doc. 1 *Schedules A and B*).

22.     Cianfichi originally filed this adversary proceeding naming the Debtor and his brother, Ronald Camarillo, as defendants and asserting several causes of action. Thereafter, pursuant to Cianfichi's motion and an order entered by the Court, Cianfichi dismissed Ronald Camarillo as a defendant and most of the causes of action, retaining only "the First Claim for Relief 11 U.S.C. §523(a)(2)(A) and the Fourth Claim for Relief 11 U.S.C. §727(a)(2)(A)." (*Motion to Dismiss Ronald Camarillo and Order Thereon*, doc. 11). Cianfichi withdrew his §523(a)(2)(A) cause of action prior to trial. (TR at 4). At the beginning of the trial Cianfichi stated that he was proceeding with causes of action under §727(a)(2)(A) and §727(a)(4)(A). (TR at 3-4).

## OPINION

**A.     Denial of Discharge Pursuant to §727(a)(2)(A)**

Section 727(a)(2)(A) provides that a debtor shall not be granted a discharge if within one year of the filing of a petition in bankruptcy the debtor "transferred, removed, destroyed, mutilated, or concealed" his property "with intent to hinder, delay, or defraud a creditor or an officer of the

Case: 03-04858    Doc# 23    Filed: 05/10/05    Entered: 05/11/05 12:31:58    Page 7 of 17

estate." *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1342 (9th Cir. 1986). Such intent may be inferred from the circumstances surrounding a transaction or from a course of conduct. *Emmett Valley Associates v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992); *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir. 1985).

Certain "badges of fraud" strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need to be present, include **1)** a close relationship between the transferor and the transferee; **2)** that the transfer was in anticipation of a pending suit; **3)** that the transferor debtor was insolvent or in poor financial condition at the time; **4)** that all or substantially all of the debtor's property was transferred; **5)** that the transfer so completely depleted the debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and **6)** that the debtor received inadequate consideration for the transfer. *In re Woodfield*, at 518. A creditor seeking denial of a debtor's bankruptcy discharge pursuant to §727(a) must prove the elements of the statute by a preponderance of the evidence. Upon a creditor presenting evidence of a debtor's intent to hinder, delay, or defraud, the burden shifts to the debtor to provide a credible explanation. *Western Wire Works, Inc., v. Lawler, (In re Lawler)*, 141 B.R. 425, 429 (9th Cir. BAP 1992).

For purposes of §727(a)(2), a transfer of real property occurs when a deed is executed. *Finalco, Inc., v. Roosevelt (In re Roosevelt)*, 87 F.3d 311, 317-318 (9th Cir. 1996), *as amended on denial of rehearing by* 98 F.3d 1169 (9th Cir. 1996), *overruled on other grounds by Murray v. Bammer (In re Bammer),* 131 F.3d 788, 792 (9th Cir. 1997) (en banc). The deeds here were executed in April of 2003, with each deed purporting to transfer a 50% interest in the Antioch Property to Ronald Camarillo, the Debtor's brother. The first deed was recorded in May of 2003, and the second in August of 2003. This bankruptcy case was filed on September 26, 2003. Accordingly, transfer of the Antioch Property occurred within one year prior to the filing of the Debtor's bankruptcy petition.

As to the badges of fraud stated above, this series of transactions obviously involved a "close relationship", since it was between the Debtor and his brother. As of April of 2003, the Debtor was

- 8 -

already in very poor financial condition. He had stepped down from his crew leader job, suffered a $20,000 reduction in income, was experiencing a "hard time" paying his debts, and was forced to borrow money from relatives. His brother took over making his mortgage payments on the Antioch Property. Later, in June of 2003, the Debtor's financial condition deteriorated even further when he became unemployed. Additionally, by this time Cianfichi had already unsuccessfully attempted on a "number of occasions" to collect the $57,200 from the Debtor. As such, Cianfichi's lawsuit to collect this money not only was anticipated, but by July 2003 it actually was filed. Moreover, transfer of the Antioch Property, by far the Debtor's largest financial asset, constituted a transfer of substantially all of the Debtor's assets.[2] By August of 2003, there was virtually nothing left to satisfy the claims of Fireside Thrift or Cianfichi. Finally, the Debtor received zero consideration in exchange for the Antioch Property. Accordingly, the Court finds that the transfers of the Antioch Property bear each of the above-stated badges of fraud.

By way of an explanation in response, the Debtor testified that due to his declining health, he transferred the Antioch Property to his brother so his children would be taken care of and could continue to live there. (TR at 43-46, 48). To preserve the Antioch Property for his children, however, the Debtor necessarily had to keep it out of the reach of his creditors, particularly Cianfichi. The Debtor's explanation fails to acknowledge that transferring the Antioch Property to his brother was, at least in large part, to ensure it would not be vulnerable to creditor collection efforts. Accordingly, the Court finds that the Debtor transferred the Antioch Property with the intent to hinder, delay or defraud his creditors.

**B.     Denial of Discharge Pursuant to §727(a)(4)(A)**

Section §727(a)(4)(A) provides that a debtor shall not be granted a discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." Denial

---

[2] The Debtor's bankruptcy petition lists total assets of just $3,250, which does not include the Antioch Property or his 401(k) account. The Debtor testified that the Antioch Property was his largest financial asset, worth about $200,000, and that he owed about $118,000 on the mortgage, suggesting about $82,000 in equity. After the transfer here, in August of 2003, Ronald Camarillo refinanced the Antioch Property and obtained a $131,000 mortgage, possibly indicating additional equity. (*See, Plaintiff's Request for Hearing on Claim Objection*, doc. #25, attached Ex. C, *Mortgage Recordation Information*).

- 9 -

of a discharge pursuant to §727(a)(4)(A) requires proof by a preponderance of the evidence of **1)** a false statement under oath or penalty of perjury; **2)** made knowingly and fraudulently; and **3)** regarding a material fact. *Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (9th Cir. BAP 2004). A creditor seeking denial of a debtor's bankruptcy discharge pursuant to §727(a)(4)(A) bears the initial burden of proof. Once it reasonably appears that the oath is false, the burden shifts to the debtor to disprove the allegation. *Torgenrud v. Schmitz (In re Schmitz)*, 224 B.R. 149, 151 (Bankr. D. Mont. 1998). An actionable false oath may involve an affirmatively false statement or an omission from the debtor's schedules. *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 62 (9th Cir. BAP 1999).[3] A false oath is complete when made. *In re Searles*, 317 B.R. at 377; *Sholdra v. Chilmark Financial LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

A debtor is required to provide full disclosure of all material information, *i.e.,* information that aids in understanding the debtor's financial affairs and transactions. *Clark v. Hammeken (In re Hammeken)*, 316 B.R. 723, 734 (Bankr. D. Ariz. 2004); *Stanley v. Hoblitzell (In re Hoblitzell)*, 223 B.R. 211, 215 (Bankr. E.D. Cal. 1998) (not for debtor to decide which assets to disclose; all assets must be scheduled so those interested in the case have accurate information). For purposes of §727(a)(4)(A), materiality is broadly defined. A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. A false statement or omission may be material even if it does not cause direct financial prejudice to creditors. *In re Wills,* 243 B.R. at 62-63. The value of omitted assets need not be significant to be material. *Ford v. Ford (In re Ford)*, 159 B.R. 590, 593 (Bankr. D. Or. 1993). An omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material if the omission or misstatement detrimentally affects administration of the estate. A discharge may be denied if such an omission adversely affects the trustee's or creditors' ability to discover other assets or to

---

[3] A debtor's bankruptcy schedules must be verified or contain an unsworn declaration under penalty of perjury. 28 U.S.C. §1746; Fed. R. Bankr. P. 1008. Accordingly, a false statement or omission in a debtor's schedules or statement of financial affairs qualifies as a "false oath" within the meaning of section 727(a)(4)(A). *Kavanagh v. Leija (In re Leija)*, 270 B.R. 497, 502-503 (Bankr. E.D. Cal. 2001).

- 10 -

fully investigate the debtor's pre-bankruptcy dealing and financial condition. *In re Wills,* 243 B.R. at 63; *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 14 (Bankr. D. Idaho 1999) (materiality concerns relation of false oath to debtor's financial affairs or bankruptcy process, not asset value).

As with §727(a)(2)(A), intent to defraud may be established by circumstantial evidence or inferred from the debtor's course of conduct, and the court may consider the above-stated badges of fraud. *In re Hoblitzell*, 223 B.R. 215; *In re Wills,* 243 B.R. at 64; *In re Hammeken*, 316 B.R. at 723. A single false oath may be sufficient to warrant denial of a discharge, although the court may find the requisite intent where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth. *In re Wills,* 243 B.R. at 64; *Garcia v. Coombs (In re Coombs)*, 193 B.R. 557, 564 (Bankr S.D. Cal. 1996).

Here, the Debtor failed to include his 401(k) account and the transfer of the Antioch Property on his bankruptcy schedules and statement of financial affairs. Each of these omissions constitutes a false oath. Moreover, these omissions are material, since the involve the two largest assets of the estate. Even after the Debtor became aware that these omissions should have been disclosed, and after he hired an attorney to work on his bankruptcy case, his schedules and statement of financial affairs were not amended to correct these omissions. *In re Searles*, 317 B.R. at 378 (debtor has continuing duty to amend schedules for accuracy). The cumulative evidence of the Debtor's conduct and omissions shows a pattern of falsity, and a reckless indifference and disregard for disclosure of the truth. Accordingly, the Court finds that omission of the 401(k) account and the Antioch Property transaction meets the elements of §727(a)(4)(A).

In response, the Debtor testified that omission of the 401(k) account and Antioch Property was an honest mistake, resulting from the paralegal not asking about either asset when drafting his petition, statements and schedules, and from the Debtor's failure to read the same prior to signing them. (TR at 51-52, 54; *Debtor's Pre-Trial Proposed Findings of Fact and Conclusions of Law* at 6). The Debtor's testimony is convenient but not credible. It is not believable that in filling out the Debtor's bankruptcy schedules and statement of financial affairs, the paralegal ask about the Debtor's automobile, clothes, and household goods, *and* about the Fireside Thrift and Cianfichi

- 11 -

lawsuits, but not about a retirement account or real property. This is particularly not credible given that the paralegal disclosed on Schedule J a $972 monthly payment for rent *or* a home mortgage. (*Petition, Schedules and Statement of Financial Affairs*, doc. 1 *Schedule J*; TR at 56).

Accordingly, as to the 401(k) account and the Antioch Property, this Court finds that the Debtor knowingly and fraudulently made a false oath. *See*, *In re Leija*, 270 B.R. at 503 (failure to read schedules generally not a defense to a §727(a)(4)(A) action; debtor cannot disclaim responsibility for statements which he made under oath "merely by playing ostrich and burying his head deeply enough in the sand.") [4]

### C. Enforceability of the $57,200 Gambling Debt

California has a strong and long-standing public policy against judicial resolution of civil disputes arising out of lawful or unlawful gambling contracts or transactions. This policy applies to bar actions to enforce gambling debts or to recover gambling losses. *Kelly v. First Astri Corporation*, 72 Cal. App. 4th 462, 477, 84 Cal. Rptr. 2d 810, 815 (1999). California's anti-enforcement policy dates back "virtually to the inception of statehood." *Metropolitan Creditors Service of Sacramento v. Sadri*, 15 Cal. App. 4th 1821, 1824, 1830, 19 Cal. Rptr. 2d 646, 648 (1993) ("enforcement of gambling debts has always been against public policy in California"). *See, Bryant v. Mead*, 1 Cal. 441, 444 (1851) (judicial enforcement of gambling debt barred as *contra bonos mores* and against the principles of sound policy);[5] *Carrier v. Brannan*, 3 Cal. 328, 329 (1853) (settled California law that no cause of action lies to recover gambling debts).[6]

---

[4] On May 26, 2004, the Trustee appointed in the Debtor's bankruptcy case filed an adversary proceeding complaint against Ronald Camarillo to avoid and recover the transfers of the Antioch Property as fraudulent. On October, 11, 2004, a default judgment was entered in that adversary proceeding in favor of the Trustee and against Ronald Camarillo, avoiding the transfers as fraudulent. *Brady v. Ronald R. Camarillo*, Adv. Pro. No. 04-4165.

[5] *Contra bonos mores*: Against good morals. *Blacks Law Dictionary*, 322 (6th ed. 1990).

[6] The reasoning underlying "California's deep-rooted policy against enforcement of gambling debts [incurred by] gambling on credit" is that "the law should not invite [gamblers] to play themselves into debt," and the judiciary should not thereafter "participate in their financial ruin." *Metropolitan Creditors Service of Sacramento v. Sadri*, 15 Cal. App. 4th at 1828, 1830.

- 12 -

In 1872, California adopted Civil Code §§1607 and 1667, making contracts based upon unlawful consideration unenforceable, thereby further strengthening its anti-enforcement policy as to gambling debts.[7] Thereafter, in *Union Collection Company v. Buckman*, 150 Cal. 159, 161 (1907), relying upon §§1607 and 1667, the California Supreme Court again reinforced this anti-enforcement policy, finding two promissory notes evidencing a gambling debt unenforceable because "under the settled law of this state the consideration for such notes was *contra bonos mores* and unlawful." *See also, Braverman v. Horn*, 88 Cal. App. 2d 379, 381 (1948) (check given in payment of a gambling debt is a contract against good morals and unenforceable under §1667); *Lavick v. Nitzberg*, 83 Cal. App. 2d 381, 383 (1948) (note founded upon a gambling consideration is unenforceable pursuant to §1667). California's "deep-rooted policy" against judicial enforcement of gambling debts continues, and has not been eroded. *Sadri*, 15 Cal. App. 4th at 1828, 1830 (the California anti-enforcement policy "remains unaffected by increased public tolerance of gambling itself or by the limited legalization of certain forms of gambling"); *First Astri Corporation*, 72 Cal. App. 4th at 489; *see also, Advanta National Bak v. Kong (In re Kong)*, 239 B.R. 815, 828 n.16 (9th Cir. BAP 1999) and *Mandalay Resort Group v. Miller (In re Miller)*, 292 B.R. 409, 413 n.3 (9th Cir. BAP 2003) (noting California's strong anti-enforcement policy as to gambling debts).

Here, the evidence shows that throughout the evening of December 10th, Leslie advanced the Debtor $60,000 in credit and provided him with that amount of chips. Although these chips could be used at Kelly's to gamble or to purchase drinks or food, the evidence shows that Leslie extended the Debtor this credit for the purpose of supplying him with gambling funds. The evidence further shows that the Debtor used these chips solely to play blackjack at Kelly's. No evidence was presented that the chips were given for a non-gambling purpose or that they were used other than to gamble. *See, Lane & Pyron, Inc., v. Gibbs*, 266 Cal. App. 2d 61, 67-68, 71 Cal. Rptr. 817, 821 (1968) (mere existence of policy that chips could be used for gambling, or food and drinks, without

---

7 Section 1607 provides that the consideration for "a contract must be lawful within the meaning of Section 1667." Pursuant to §1667, unlawful consideration is that which is contrary to **1)** an express provision of law; **2)** the policy of express law, though not expressly prohibited; or **3)** otherwise contrary to good morals.

- 13 -

more, is insufficient to prove that credit was extended for a purpose other than to gamble). Finally, it is undisputed that except for $2,800, the Debtor lost all of the $60,000 in credit extended to him, leaving a balance of $57,200 owed to Kelly's. Accordingly, this Court finds that the California anti-enforcement policy and §§1607 and 1667, bar Cianfichi's cause of action to collect on the $57,200 gambling debt.

Cianfichi asserts that the following language from *Hamilton v. Abadjian*, 30 Cal. 2d 49, 179 P.2d 804 (1947) should control here:

> "The owner of a gambling house who honors a check for the purpose of providing a prospective customer with funds with which to gamble, and who then *participates in the transaction thus promoted by his act,* cannot recover on the check."

30 Cal. 2d at 52 (italics added). Cianfichi asserts that because neither he nor Kelly's banked or played in the blackjack game, neither participated in the game. As such, Cianfichi asserts that pursuant to the above language from *Hamilton*, he should be allowed to recover the $57,200 from the Debtor. Cianfichi's reliance on *Hamilton* is misplaced.

In *Hamilton,* the California Supreme Court reaffirmed "the general rule which prevails in California [that California courts] refuse to lend their process to recover losses in gambling transactions." 30 Cal. 2d at 51. The *Hamilton* case, however, was the first time "the rule in California against enforcement of gambling debts was . . . put to the test" following the "advent of legalized gambling in the State of Nevada." *Sadri*, 15 Cal. App. 4th at 1825-1826. As such, *Hamilton* did not alter the long-established California anti-enforcement rule in dealing with parties who extend credit and also participate in the game. Rather, this language merely states the California anti-enforcement rule within the context of the facts present in *Hamilton* - that of a legalized Nevada gambling establishment which extended the defendant credit to gamble in house *and* which then also banked the game. The court in *Sadri* recognized this when it stated that "[t]he *Hamilton* court stated the anti-enforcement rule within a context more specific to the facts of that case." *Sadri*, 15 Cal. App. 4th at 1826. Similarly, this same distinction is highlighted in *Rose v. Nelson*, 79 Cal. App. 2d 751, 180 P. 2d 749 (1947). That case was decided less than three weeks

- 14 -

after *Hamilton*, and cited it as authority. It sets forth a general rule consonant with the broad California anti-enforcement policy:

> "a lender who advances money to a borrower with the understanding that it is to be used in gambling, ***or*** who participates and shares in the gambling transaction thus promoted by his act, becomes *particeps criminis* and cannot recover the money thus advanced."

79 Cal. App. 2d at 751-752 (bolded and underlined italics added).[8] Accordingly, the above-stated language from *Hamilton* applies to the Nevada-style facts of that case, which are not present here.

In contrast to Nevada, California law does not allow the house, such as Kelly's, to bank or play in the games it hosts. Cal. Business & Professions Code §19805(c); Penal Code §330.11; *see also, Hotel Employees*, 21 Cal. 4th at 608 (game may be banked by someone other than owner of the gambling facility). Applying the above language from *Hamilton* here is not only improper, but would obliterate the long-established California anti-enforcement rule and Civil Code §§1607 and 1667. Such an application would exempt from the anti-enforcement policy the gambling debt collection efforts of California cardroom owners, such as Cianfichi, who extend credit to customers to gamble but who do not bank or play in their hosted games. Such a result is not supported by any of the case law presented here, and this Court's research did not locate any such authority. Moreover, it would be an odd result, indeed, if the California law prohibiting Cianfichi from banking and playing in his hosted games also shielded him from application of the broad anti-enforcement policy and §§1607 and 1667. Cianfichi's alleged non-participation does not render his effort to collect the $57,200 gambling debt exempt from the California anti-enforcement policy, or lawful pursuant to §§1607 and 1667.

Finally, Cianfichi's reliance upon §19805(aa) and (bb) of the California Business and Professions Code as authority to limit the definition of participation to only banking and playing in a gambling game is also misplaced. (*Plaintiff's Trial Brief* at 5; *Plaintiff's Post-Trial Brief* at 6).

---

[8] *Particeps Criminis*: A participant in a crime; an accomplice. One who shares or co-operates in a criminal offense, tort or fraud. *Blacks Law Dictionary*, 1118 (6th ed. 1990).

- 15 -

While banking and playing the game constitute participation, neither §19805(aa) or (bb) defines or limits participation as such.[9] In the instant case Leslie, who Cianfichi acknowledged was acting out of her own "selfish interest" to earn tip money, kept the Debtor gambling by advancing him $60,000 in credit. That was six times the amount maintained in the Player's Bank to cover bets made at the card tables, and 1,000 to 3,000 times greater than Cianfichi's advances to good customers. Throughout the evening of December 10th, Leslie periodically and automatically asked the Debtor, who had consumed "quite a bit of alcohol," if he wanted additional chips. Leslie then filled out the markers listing Kelly's as the payee and presented them to the Debtor for his signature. Accordingly, even if the above language from *Hamilton* applies, on the facts of this case, Kelly's participated in and fostered the gambling by its employees' extension of credit to the Debtor.

## CONCLUSIONS OF LAW

1. Pursuant to §727(a)(2)(A) and §727(a)(4)(A) of the Bankruptcy Code, entry of a discharge on behalf of the Debtor in the above-captioned bankruptcy case is hereby denied;

2. Pursuant to the California anti-enforcement policy and Civil Code §§1607 and 1667, the $57,200 gambling debt incurred by the Debtor at Kelly's is unenforceable under California law.

**IT IS SO ORDERED**.

\*\* END OF ORDER\*\*

---

[9] Section 19805(aa) provides that " 'Player' means a patron of a gambling establishment who participates in a controlled game." Section 19805(bb) provides, in pertinent part, that " 'Player-dealer' ... refers to a position in a controlled game . . . in which seated player participants are afforded the temporary opportunity to wager against multiple players at the same table."

COURT SERVICE LIST

Jeffrey J. Rooney
Law Offices of Brule and Rooney
1500 Newell Ave. #409
Walnut Creek, CA 94596

Lawrence L. Szabo
Law Offices of Lawrence L. Szabo
3608 Grand Ave., Suite 1
Oakland, CA 94610-2024

U. S. Trustee
1301 Clay St., #690N
Oakland, CA 94612